## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## BRUNSWICK DIVISION

| | | |
|---|---|---|
| STATE OF MISSOURI,<br>STATE OF GEORGIA,<br>STATE OF ALABAMA<br>STATE OF ARKANSAS,<br>STATE OF FLORIDA,<br>STATE OF NORTH DAKOTA, and<br>STATE OF OHIO<br><br>   *Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF<br>EDUCATION,<br><br>MIGUEL A. CARDONA, in his official<br>capacity as Secretary, United States<br>Department of Education, and<br><br>JOSEPH R. BIDEN, Jr., in his official<br>capacity as President of the United States,<br><br>   *Defendants*. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. _____<br><br>**EMERGENCY TRO requested<br>immediately, but no later than<br>September 6, 2024**<br><br>**If necessary, TRO hearing requested as<br>soon as possible** |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1. Plaintiff States are forced to seek emergency TRO relief or relief under 5 U.S.C. § 705 because the States have just uncovered documents proving that the Secretary of Education (1) is unlawfully trying to mass cancel hundreds of billions of dollars of loans, and (2) has quietly instructed federal contractors to "immediately" begin cancellation as early as September 3, 2024 (but possibly beginning on September 7). The States respectfully request immediate relief pending further briefing and argument on the merits in order to avoid unlawful forgiveness of $73 billion overnight, with hundreds more billions in losses to follow.

2.      This is the *third* time the Secretary has unlawfully tried to mass cancel hundreds of billions of dollars in loans.  Courts stopped him the first two times, when he tried to do so openly.  So now he is trying to do so through cloak and dagger.

3.      Last year, the Supreme Court declared the Secretary's attempt to "elide the statutory text" to be a "staggering" effort to "unilaterally alter large sections of the American economy." *Biden v. Nebraska*, 143 S. Ct. 2355, 2372–73, 2375 (2023).  This "HEROES Plan" purported to rely on the HEROES Act.

4.      Just minutes after the Supreme Court issued its decision, the Secretary announced he was finalizing his backup mass cancellation plan—the SAVE Plan—under a different statute to again unlawfully mass cancel nearly $500 billion in student loans.  Last month, the Eighth Circuit blocked it, noting that the Secretary's latest "attempt to engage in mass student-loan cancellation" was "even larger in scope" and that the Secretary's argument on the text could not amount to "even mere plausibility."  *Missouri v. Biden*, No. 24-2332, 2024 WL 3738157, at *2–3 (8th Cir. Aug. 9, 2024).

5.      One would have hoped the Secretary would have learned to stick with the statutory forgiveness programs that Congress actually passed.  Instead, the only lesson the Secretary learned was the need for secrecy.  In April, the Secretary published a notice of proposed rulemaking for a third attempt at mass cancellation under yet a third statute.  Through compulsory process at the end of August, the States have just obtained documents proving that the Secretary is implementing this plan *without* publication and has been planning to do so since May.  Those documents instruct third-party organizations that service federal loans to begin cancelling hundreds of billions of dollars beginning potentially **this week**.

6.      This third attempt is the Secretary's most aggressive yet.  When the Secretary promulgated the HEROES plan, he agreed to stay implementation pending litigation.  For the SAVE plan, the Secretary refused to agree, but the States at least had a few months of notice before the plan went into effect.

7.      But this time, the Secretary quietly sent orders to loan servicing companies to start mass cancelling loans **as soon as this week**.  That is both extraordinarily inequitable and also expressly violates a statute prohibiting the Secretary from implementing rules like this one sooner than 60 days after publication.

8.      Not only is this attempt the Secretary's most aggressive.  It is also the weakest one yet.  The Secretary has already failed to mass cancel student loans with the two statutes he thought were more plausible.  It is thus unsurprising that this third plan rests on the least plausible textual authority yet.  Indeed, this newest plan contradicts what the Department said just three years ago.  In 2021, it expressly concluded that the text on which the Secretary now relies does *not* provide authority to create a student loan forgiveness program.

9.      All this explains why the Secretary now is trying to quietly rush this rule out too quickly for anybody to sue.  He knows that "the States cannot turn back the clock on any loans that have already been forgiven."  *Missouri*, 2024 WL 3738157 at *4.  So it does not matter how many rules he breaks in the process, so long as he forgives billions of dollars in debt before the courts stop him.

10.     This Court should not permit that brazenly lawless action to continue.  Regrettably, the Secretary's extraordinary actions have made immediate relief—including through a TRO—necessary.

## THE PARTIES

11.     Plaintiff State of Missouri is a sovereign State of the United States of America. Missouri sues to vindicate its sovereign, quasi-sovereign, financial, employment, and proprietary interests.

12.     Andrew Bailey is the 44th Attorney General of the State of Missouri.  Attorney General Bailey is authorized to bring actions on behalf of Missouri that are "necessary to protect the rights and interests of the state, and enforce any and all rights, interests or claims against any and all persons, firms or corporations in whatever court or jurisdiction such action may be necessary."  Mo. Rev. Stat. § 27.060.

13.     Plaintiff State of Georgia is a sovereign state of the United States of America. Georgia sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests.

14.     Christopher M. Carr is the Attorney General of the State of Georgia.  He is authorized by Georgia law to sue on the State's behalf.  GA Code § 45-15-3(6).

15.     Plaintiff State of Alabama is a sovereign state of the United States of America. Alabama sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary rights.

16.     Steve Marshall is the Attorney General of Alabama.  Attorney General Marshall is the chief legal officer for the State of Alabama and has the authority to represent Alabama in federal court.  Ala. Code § 36-15-1(2).

17.     Plaintiff State of Arkansas is a sovereign state of the United States of America. Arkansas sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests.

18.     Tim Griffin is the Attorney General of Arkansas.  Attorney General Griffin is authorized to "maintain and defend the interests of the state in matters before the United States Supreme Court and all other federal courts."  Ark. Code Ann. 25-16-703.

19.     Plaintiff State of Florida is a sovereign state of the United States of America. Florida sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests and those interests of its political subdivisions.  *See Florida v. Becerra*, 544 F. Supp. 3d 1241, 1253 (M.D. Fla. 2021) (recognizing that for standing purposes the State of Florida includes its political subdivisions).

20.     Ashley Moody is the Attorney General of the State of Florida.  She is authorized by Florida law to sue on the State's behalf.  *See* § 16.01, Fla. Stat.

21.     Plaintiff State of North Dakota is a sovereign State of the United States of America. North Dakota sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests.

22.     Drew Wrigley is the Attorney General of North Dakota.  Attorney General Wrigley is authorized to "[i]nstitute and prosecute all actions and proceedings in favor or for the use of the state."  N.D.C.C. § 54-12-01(2).

23.     Plaintiff State of Ohio is a sovereign state of the United States of America.  Ohio sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests.

24.     Dave Yost is the Attorney General of Ohio.  Attorney General Yost is Ohio's chief law enforcement officer and "shall appear for the state in the trial and argument of all civil and criminal causes in the supreme court in which the state is directly or indirectly interested."  Ohio Rev. Code § 109.02.

25.     Defendants are officials of the United States Government and United States governmental agencies responsible for implementing the Third Mass Cancellation Rule.

26.     Defendant United States Department of Education (the "Department") is an agency of the United States government, located at 400 Maryland Avenue, S.W., Washington, D.C. 20202.

27.     Defendant Miguel A. Cardona is the United States Secretary of Education (the "Secretary") and is responsible for the operation of the Department, including the issuance of the challenged rule. 20 U.S.C. § 3411.  He is sued in his official capacity.

28.     Defendant Joseph R. Biden, Jr., is the President of the United States of America. He is sued in his official capacity.

## JURISDICTION AND VENUE

29.     This Court has jurisdiction pursuant to 5 U.S.C. §§ 701–706 and 28 U.S.C. §§ 1331, 1361, and 2201.

30.     This Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. §§ 702, 705, and 706, 28 U.S.C. §§ 1361 and 2201–2202, and its inherent equitable powers.

31.     Venue is proper in this district under 28 U.S.C. § 1391(e)(1).  Defendants are United States agencies or officers sued in their official capacities.  Plaintiff Georgia is a resident of this judicial district because a State resides everywhere within its borders, as every court to consider the issue has unanimously held.  *See, e.g.*, *Missouri v. Biden*, No. 4:24-CV-00520-JAR, 2024 WL 3104514, at *20 (E.D. Mo. June 24, 2024) ("A state is ubiquitous throughout its sovereign borders." (citing *California v. Azar*, 911 F.3d 558, 570 (9th Cir. 2018)).

32.     Venue is also appropriate because every State in the Eleventh Circuit is a plaintiff in this action.

33.     Plaintiff States Missouri, Georgia, Alabama, Arkansas, Florida, North Dakota, and Ohio, bring this action to redress harms to their sovereign, quasi-sovereign, financial, and proprietary interests, including their interests under 5 U.S.C. § 702.

## FACTUAL ALLEGATIONS

**I.     The Higher Education Act of 1965 and Amendments.**

34.     The Higher Education Act of 1965 ("the HEA") was enacted "to increase educational opportunities and 'assist in making available the benefits of postsecondary education to eligible students in institutions of higher education.'" *Biden*, 143 S. Ct. at 2362 (quoting 20 U.S.C. § 1070(a)) (cleaned up).

35.     Among other things, the HEA provided for two different forms of financial assistance: grants and loans.  *See* 20 U.S.C. § 1070-1070h, § 1071-1087-4.

36.     Initially, the HEA authorized the Federal Government only to guarantee private loans.  20 U.S.C. §§ 1071 et seq.  In 1993, however, Congress amended the HEA to authorize direct loans from the Federal Government to students through the William D. Ford Federal Direct Loan Program and allowed the Department to offer plans for repayment of student loans. 20 U.S.C. §§ 1087a *et seq.*

37.     The HEA provides five repayment plans, under the Direct Loan program generally: (i) "a standard repayment plan, with a fixed annual repayment amount paid over a fixed period of time, not to exceed 10 years;" (ii) "a graduated repayment plan paid over a fixed period of time, not to exceed 10 years;" (iii) "an extended repayment plan, with a fixed annual or graduated repayment amount paid over an extended period of time, not to exceed 25 years;" (iv) "an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years;" and (v) "an income-based repayment plan that enables borrowers who have a partial financial hardship to make a lower monthly payment."  20 U.S.C. § 1087e(d)(1).

38.     The HEA generally requires individuals to repay their loans plus interest.  The Act requires "repayment of such loan, including principal and interest," § 1087e(d)(1), and further

requires that the "balance due" from each borrower "shall equal the unpaid principal amount of the loan, any accrued interest, and any fees," § 1087e(e)(5).

39.     Only one of these repayment plans, the income-based repayment plan (IBR), creates an exception to the repayment requirement.  It prescribes specific payments and then provides the Secretary with authority to "repay or cancel any outstanding balance of principal and interest due" by a borrower after 20 to 25 years of those statutory payment amounts.   20 U.S.C.§ 1098e(b)(7).

40.     Beyond the income-based repayment plan, Congress has authorized forgiveness "only in certain limited circumstances." *Biden*, 143 S. Ct. at 2363; *see, e.g.*, 20 U.S.C. §§ 1087e(m), 1087ee.  In these cases, as with the IBR plan, the Act creates an explicit exception to student loan repayment obligations.  *E.g.*, § 1087ee ("Cancellation of loans for certain public service"—teachers, military service members, and Peace Corps volunteers).

41.     The HEA does not permit broad interest waivers or subsidies in the Direct Loan program.  Instead, Congress has only authorized the Secretary to subsidize unpaid interest in the IBR program "for a period of not more than 3 years" after a borrower opts-in to that program.  20 U.S.C. § 1098e(b)(3)(A).  No parallel provisions exist in any of the other Direct Loan program repayment plans.

## II.     The President, Department, and Congress all conclude that the Secretary lacks authority to forgive loans under section 432(a) (20 U.S.C. 1082(a)).

42.     Congress has not enacted any substantial amendments to the HEA, or otherwise passed laws amending the treatment of student debt, since 2010, when Congress accepted President Obama's call to make the IBR forgiveness program more generous.

43. But that does not mean that Congress has left the issue un-considered. "'More than 80 student loan forgiveness bills and other student loan legislation' were considered by Congress during its 116th session alone." *Biden*, 143 S. Ct. at 2373.

44. But advocates in Congress of forgiveness more generous than what is provided in existing programs have not succeeded in convincing their legislative colleagues to support their measures. So those members began to assert that the President could skirt Congress and cancel loans through executive action. In September 2020, thirteen Senators introduced a resolution asserting that the President and Secretary have statutory power to mass cancel student debt immediately. These members cited section 432(a) of the HEA, codified at 20 U.S.C. 1082(a)), for their argument. *Schumer, Warren: The Next President Can and Should Cancel Up To $50,000 In Student Loan Debt Immediately; Democrats Outline Plan for Immediate Action in 2021* (Sept. 17, 2020).[1]

45. But President Biden, Speaker of the House Pelosi, and the Department expressly disagreed.

46. Biden described the idea that he could "cancel large amounts of debts" as "pretty questionable." Stratford, *Schumer, White House at Odds over How to Cancel Student Loan Debt*, Politico (Feb. 4, 2021).[2]

47. Speaker of the House Nancy Pelosi professed: "People think that the President of the United States has the power for debt forgiveness. He does not. . . . That has to be an act of

---

[1] https://www.warren.senate.gov/newsroom/press-releases/schumer-warren-the-next-president-can-and-should-cancel-up-to-50000-in-student-loan-debt-immediately-democrats-outline-plan-for-immediate-action-in-2021
[2] https://www.politico.com/news/2021/02/04/schumer-biden-student-loan-debt-466054

Congress. . . . The President can't do it." Lauren Camera, *Pelosi: Biden Lacks Authority to Cancel Student Debt*, U.S. News & World Report (July 28, 2021).[3]

48.    And most notably, the Department of Education issued a memorandum in 2021 expressly disclaiming authority under section 432 to create a forgiveness program.  *See* Reed Rubinstein Memorandum (Jan. 12, 2021), attached hereto as Exhibit A.

49.    The rest of Congress also disagreed with the section 432 argument pressed by Senators Schumer and Warren.  When resolutions pressing the idea were introduced in both the House and Senate, both resolutions failed.  S.R. 46, *A Resolution Calling on the President of the United States to Take Executive Action to Broadly Cancel Federal Student Loan Deb*t, 117th Congress (2021);[4] H.R. 100, *Calling on the President of the United States to Take Executive Action to Broadly Cancel Federal Student Loan Debt*, 117th Cong. (2021).[5]

## III.    The President and Department reverse their position and (unsuccessfully) attempt to mass cancel loans twice.

50.    Finally, despite previously recognizing that they lacked authority to cancel large amounts of student loans, the Biden administration bowed to political pressure and chose to bypass Congress.

51.    On August 24, 2022, the Administration announced that, under the HEROES Act, it would cancel $10,000 to $20,000 in student debt for all borrowers who have loans owned by the Department and whose annual income was less than $125,000 (or $250,000 for married borrowers

---

[3] https://www.usnews.com/news/education-news/articles/2021-07-28/pelosi-biden-lacks-authority-to-cancel-student-debt
[4] https://www.congress.gov/bill/117th-congress/senate-resolution/46
[5] https://www.congress.gov/bill/117th-congress/house-resolution/100

who file jointly).  *FACT SHEET: President Biden Announces Student Loan Relief for Borrowers Who Need It Most*, The White House (Aug. 24, 2022).[6]

52.     Six states—including Plaintiff States Missouri and Arkansas here—sued in federal court to block that unlawful executive action.  They were successful.

53.     In *Biden v. Nebraska*, the Supreme Court rejected Defendants' assertion that they could use a vague provision of the HEROES Act as authority to transfer half a trillion dollars in wealth from taxpayers to student loan borrowers.  143 S. Ct. 2355 (2023).

54.     In holding that "the HEROES Act provides no authorization for the Secretary's plan," the Supreme Court also found that "the 'economic and political significance' of the Secretary's action is staggering by any measure."  *Id.* at 2373 (citing *West Virginia v. EPA*, 597 U.S. 697 (2022) (cleaned up)).  Beyond "the ordinary tools of statutory interpretation," the Defendants' efforts were unlawful because "the basic and consequential tradeoffs inherent in a mass debt cancellation program are ones that Congress would likely have intended for itself."  *Id.* at 2375 (cleaned up).

55.     But the President and the Secretary were relentless in their pursuit of mass loan cancellation.  Just minutes after the Supreme Court struck down the Defendants' HEROES Act gambit, the Secretary criticized the ruling sharply, calling it an "outrage," and announced that he was "today" responding to the rule by "finaliz[ing]" a new regulation to again try to mass cancel nearly $500 billion in loans. *Secretary Cardona Statement on Supreme Court Ruling on Biden Administration's One Time Student Debt Relief Plan*, Department of Education (June 30, 2023).[7]

---

[6] https://www.whitehouse.gov/briefing-room/statements-releases/2022/08/24/fact-sheet-president-biden-announces-student-loan-relief-for-borrowers-who-need-it-most/
[7] https://www.ed.gov/news/press-releases/secretary-cardona-statement-supreme-court-ruling-biden-administrations-one-time-student-debt-relief-plan

56.     At the same time, Defendant Biden declared he would "stop at nothing" to mass cancel loans.  *Statement from President Joe Biden on Supreme Court Decision on Student Loan Debt Relief*, The White House (June 30, 2023).[8]

57.     Defendants published their plan ten days later on July 10, 2023, calling their new plan to mass cancel loans the "SAVE" plan.  This new plan purported to rely on the Secretary's authority (created by amendments to the HEA in 1993) to create "income-contingent repayment" plans.  This new plan operated by slashing payment amounts down to as low as $0 for millions of borrowers and forgiving their balances after as few as 10 years of $0 "payments."  That plan was even more ambitious than the first, offering mass loan forgiveness to 98 percent of Americans to the tune of $475 billion over just the first 10 years.

58.     That plan also has been enjoined.  Two different coalitions of States sued in two different district courts and both obtained relief from those district courts.[9]  Then after the Federal Government created a new plan—what the Government itself called a "hybrid" plan—without going through notice and comment, the Eighth Circuit issued an injunction against this new hybrid plan, confirming that Defendants' SAVE Plan is unlawful.  *Missouri v. Biden*, No. 24-2332, 2024 WL 3738157 (8th Cir. Aug. 9, 2024).

59.     The Eighth Circuit did not mince words, concluding that this second "attempt to engage in mass student-loan cancellation" is "even larger in scope" than the HEROES Plan attempt and "the text of the HEA makes a showing [by the Defendants] of even mere plausibility difficulty."[10]  The opinion enjoined Defendants "from any further forgiveness of principal or interest, from not charging borrowers accrued interest, and from further implementing SAVE's

---

[8] https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/30/statement-from-president-joe-biden-on-supreme-court-decision-on-student-loan-debt-relief/
[9] In an unreasoned, summary order, a divided Tenth Circuit stayed the District of Kansas' decision.
[10] https://ago.mo.gov/wp-content/uploads/2024-8-9-Eighth-Circuit-Student-Loan-Win.pdf

payment-threshold provisions" "for any borrower whose loans are governed in whole or in part" by the SAVE Rule.  *Id.*

60.     Following the Eighth Circuit's ruling, Defendants filed in the Supreme Court an application to vacate the injunction pending appeal.  Last week, on August 28, 2024, the Supreme Court rejected Defendants' application without any dissent.

**IV.    The President and Secretary launch a third attempt to mass cancel loans.**

61.     In their relentless pursuit of unlawfully cancelling hundreds of billions of dollars in student loans, the President and Secretary are at it again.

62.     On April 17, 2024, not long after the two state coalitions sued to block the second attempt at mass loan forgiveness, Defendants published a notice of proposed rulemaking (NPRM) titled *Student Debt Relief for the William D. Ford Federal Direct Loan Program (Direct Loans), the Federal Family Education Loan (FFEL) Program, the Federal Perkins Loan (Perkins) Program, and the Health Education Assistance Loan (HEAL) Program*, 89 C.F.R. 27,564 (Apr. 17, 2024), attached hereto as Exhibit B.

63.     The NPRM adopts the legal theory proposed by Senators Schumer and Warren that was previously rejected by the President, the Speaker of the House, Congress, and the Department. It proposes to promulgate regulations "to provide for the waiver of certain student loan debts" and "modify the Department's existing debt collection regulations to provide greater specificity regarding certain non-exhaustive situations in which the Secretary may exercise discretion to waive *all* or part of *any* debts owed to the Department."  *Id.*  Despite the economic and political significance of the NPRM, the Department limited the comment period to just thirty days.  *Id.*

64.     The NRPM purports to authorize forgiveness in reliance on section 432(a)(6) of the HEA (the same one Senators Schumer and Warren relied on), which is codified at 20 U.S.C.

§ 1082(a)(6).  That text authorizes the Secretary to "enforce, pay, compromise, waive, or release any right, title, claim, lien, or demand, however acquired, including any equity or any right of redemption."  *Id.*

65.     The first problem for Defendants is that this text is strikingly similar to the HEROES Act, which the Supreme Court held did not authorize forgiveness.   20 U.S.C. § 1098bb(a) (giving the Secretary authority to "waive or modify any statutory or regulatory provision applicable to the student financial assistance programs").

66.     The second, and perhaps more major, problem is that this provision does not apply to the Direct Loan program at all; it applies only to the now-defunct FFEL *private* loan program. Defendants do not dispute this.  89 Fed. Reg. 24,566, n.4.

67.     So in order to try to rely on the text from the FFEL private program, Defendants assert that "[i]n creating the Direct Loan program, Congress established parity between the FFEL and Direct Loan program, providing that Federal Direct Loans 'have the same terms, conditions, and benefits as loans made to borrowers,' under the FFEL program."  *Id.*  They assert this by relying on Section 451(b)(2) of the Act, 20 U.S.C. § 1087a(b)(2), which provides that "loans made to borrowers under [the Direct Loan program] have the same terms, conditions, and benefits as loans made under section 428 [20 U.S.C. § 1078]."

68.     The problem of course is that the Direct Loan program only incorporates the terms and conditions of section 428, *not* section 432—*i.e.*, 20 U.S.C. § 1078, not § 1082.  *See Pennsylvania Higher Educ. Assistance Agency v. Perez*, 416 F. Supp. 3d 75, 96 (D. Conn. 2019).

69.     Proceeding in reliance on section 432 even though the Direct Loan program does *not* incorporate section 432, Defendants assert authority for the Secretary to "waive all or part of *any* debts under the Federal Family Education Loan Program . . .  the William D. Ford Federal

Direct Loan Program . . . the Federal Perkins Loan Program . . . and the Health Education Assistance Loan Program . . . under the conditions included in, but not limited to, §§ 30.81 through 30.88." 89 Fed. Reg. 27,614 (emphasis added) (creating a 34 C.F.R. § 30.80).

70.     Summed up, these new provisions (1) create an end-run around existing injunctions by granting forgiveness to borrowers who cannot sign up for plans that have been enjoined, (2) forgive interest for millions of borrowers up to $20,000, and (3) forgive balances for borrowers who attended programs that the Secretary (in his sole discretion) believes were not valuable programs.

71.     Defendants summarize §§ 30.81 through 30.88 as authorizing the Secretary to:

    i.      Forgive to the tune of $73 billion the amount by which a borrower's current loan has an outstanding balance greater than the original principal of the loan—in other words, forgive all interest,

          a.    For individuals on income-driven plans and have household incomes of less than $240,000 (married filing jointly) or $120,000 (single), all interest (capitalized and uncapitalized) is forgiven (§ 30.81);

          b.    For all other individuals (including households making more than $240,000 a year), forgiveness is limited to $20,000 per borrower (§ 30.82);

    ii.     Forgive balances for undergraduate borrowers after 20 years and graduate borrowers after 25 years (§ 30.83);

   iii.     Forgive balances for borrowers whom the Secretary believes "meets the criteria for forgiveness under an IDR plan," such as the SAVE Plan, even though they did not sign up for that plan and even though some of those plans (including the SAVE Plan) have been enjoined (§ 30.84);

   iv.     Forgive balances for every borrower whom the Secretary believes "meets the eligibility criteria" for forgiveness under the FFEL private loan program or Direct Loan program even though they did not apply (§ 30.85);

    v.     Forgive balances for borrowers who obtained a loan from an institution or program that the Secretary has determined is no longer eligible to participate in the federal grant and loans program—even though the institutions were eligible at the time (§ 30.86);

     vi.     Forgive balances for borrowers whose institutions have closed, if the Secretary believes the institution "for at least one year" did not meet the Secretary's accountability standard or "failed to provide sufficient financial value to students and was subject to a program review, investigation, or any other Department action that remained unresolved at the time of closure" (§ 30.87); and

     vii.    Forgive balances for individuals who enrolled in "gainful employment" programs (non-degree programs) that have closed and which the Secretary believes did not lead to high enough incomes (§ 30.88).

72. Defendants also state that they will forgive balances on former FFEL private loans that borrowers have refinanced/consolidated into Direct Loans. 89 Fed. Reg. 27,569 (§ 682.403(f)).

73. Separately, Defendants seek to remove the current requirement that the Secretary use the Federal Claims Collection Standards (FCCS)—a joint Department of Treasury and Department of Justice regulatory scheme based on 31 U.S.C. § 3711. *Id.* at 27,613. The FCCS provides limited circumstances in which a government agency may compromise a debt of under $100,000. *See* 31 C.F.R. § 902.

74. Defendants estimated that implementation of its provisions would cost $146.9 billion. 89 Fed. Reg. 27,565–66.

75. That estimate was based on the flawed assumption that Defendants would succeed in promulgating and defending their second attempt at mass cancellation, which they have not. Their Third Mass Cancellation Rule attempts to provide relief under the SAVE Plan indirectly to individuals despite the existing injunction. The actual cost of the Third Mass Cancellation Rule is thus the $146.9 billion estimated by the Department plus much of the $475 billion cost of the SAVE Plan.

76. On May 16, 2024, Plaintiff States submitted a comment to the Department, notifying the Department of its lack of authority to promulgate this Rule.

**V.      Defendants' Rush To Implement The Third Mass Cancellation Rule Before Congressional and Judicial Review.**

77.     Given the extraordinary cost of this Rule, the Federal Government has unsurprisingly classified this rule as a "major" rule under the Congressional Review Act. *See* Office of Information and Regulatory Affairs, RIN: 1840-AD93.[11]

78.     Under federal law, "major" rules are not permitted to take effect until 60 days after publication. 5 U.S.C. § 801(a)(3). The purpose of this law is to give Congress an opportunity to review the rule—and perhaps vote to repeal it—before the rule goes into effect. *Id.* § 801(a), (b).

79.     Yet despite not formally publishing their Third Mass Cancellation Rule, Defendants have already quietly instructed the half-dozen loan-servicing organizations that contract with the Federal Government to immediately start cancelling loans and balances beginning as early as this week and to fully implement the Third Mass Cancellation Rule by September 20.

80.     Following the Eighth Circuit's injunction of the SAVE Rule, Defendants took the extraordinary step of using the Secretary's email list for political purposes. The Secretary emailed student loan borrowers blaming "Republican elected officials" for the court's injunction, and pledged to "keep fighting" to forgive student loan balances.[12]

81.     The Secretary then again emailed student loan borrowers, writing that "the U.S. Department of Education (ED) aims to provide debt relief to certain borrowers this fall," and informing borrowers that "[i]f you WANT to be included in potential student debt relief, you don't need to take any action." Aug. 1, 2024, Form Email from Miguel A. Cardona, attached hereto as Exhibit C. Each borrower had until the end of August to decide whether to opt-out. *Id.* The email

---

[11] https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202404&RIN=1840-AD93
[12] https://mirror.mail.studentaid.gov/nl/jsp/m.jsp?c=%40uJXGuybhu6MC0dBm31u7vg%2FPgAmCsgrNujn3iAcSQkM%3D

explained that "the regulations would authorize [the Secretary] to provide partial or full debt relief to borrowers" in four circumstances: (a) "Borrowers who owe more than they did at the start of repayment;" (b) "Borrowers who first entered repayment many years ago;" (c) "Borrowers who are otherwise eligible for loan forgiveness but have not yet applied;" and (d) "Borrowers who enrolled in low-financial value programs." These provisions are the same as those proposed in the NPRM.

82.     Defendants' unusual decision to ask people to confirm whether they want to opt out of a program *before* it is even published created concern that Defendants are planning to unlawfully rush out the Third Mass Cancellation Rule to cancel as much debt as possible, creating a *fait accompli* before anybody has time to challenge the action.

83.     Sure enough, in late August the States used compulsory process to obtain documents sent from the Secretary to federal contractors instructing those contractors to begin cancelling loan balances beginning as early as September 3.

84.     Specifically, the Department sent the contractors—including Missouri's public instrumentality and contractor, MOHELA—a document entitled "Business Operations Change Request Form" plus attachments. *See* Business Operation Change Request Form (May 31, 2024), attached hereto as Exhibit D (in an abundance of caution, Plaintiff States file this exhibit under seal because the document purports to include some "include[ ] nonpublic and confidential information." *Id.* at 1.

85.     The document instructs all servicing organizations to report balances of all loans to the Department between September 2 and September 5 and to fix any errors by September 6. *Id.* at 3.

86.     At that point, the Department will submit "forgiveness files" to the contractors, which the contractors are instructed to process "*immediately* upon receipt." *Id.* at 4 (emphasis added).

87.     On August 21, 2024, a Department representative emailed MOHELA an "updated schedule" for the Third Mass Cancellation Rule, which provided that "[t]he anticipated *completion* date" for all debt discharge "will be three business days after delivery of the discharge file. *See* Aug. 21, 2024, Department Email (emphasis added), attached hereto as Exhibit E.

88.     So if a servicing organization reports a set of balances to the Department on September 2 without error or if errors are resolved by then, loan servicing organizations will be required to "immediately" forgive loans as early as September 3.  If servicing organizations take the full time allotted to resolve errors—until September 6—then "immediate" forgiveness will begin as soon as September 7.

89.     The immediate, overnight harm will be at least $73 billion.  That is the Secretary's estimate for the amount of loans that will be immediately cancelled on day one from the provisions wiping out loan balances that exceed original-principal balances.  The full cost of the rule will only grow every day after that.

90.     Department communications make clear that the scheduling details have long been set in stone. The Secretary initially sent a Change Request form dated May 31, 2024, with an "anticipated implementation date" of September 1.  Then on June 18, the Secretary sent a revised attachment to the Change Request form (included in the exhibit) that made clear the implementation date was no longer "anticipated."  June 18, 2024 Department Email, attached hereto as Exhibit F at 3.

91.     Then, on August 2, 2024, the Department informed servicers that it "cannot change the due date" and prodded them to have their systems tested "before implementation."  Aug. 2, 2024, Department Email, attached hereto as Exhibit G.

92.     Moreover, the Department instructs the contractors to backdate forgiveness. In the initial change request in May, the Department states: "All forgiveness shall be applied with an effective date of 9/1/2024."  Ex. F, at 3.  Then last month, the Department appears to have changed this position, answering a servicer question by saying that forgiveness may now have an "effective date" of June 1, 2024.  *See* Department Email, attached hereto as Exhibit H.

93.     As if there could be any doubt, the Department has refused the opportunity to confirm that it will wait the statutorily prescribed time before implementing the Third Mass Cancellation Rule.  In response to questioning from congressional staff, the Department "refused to answer basic questions" about the timing of implementation.  *See* Representative Virginia Foxx Letter, attached hereto as Exhibit I at 2.  Representative Virginia Foxx then wrote a letter to the Secretary, expressing concern with the Department's "aberrant approach" and requesting that the Secretary, before August 21, respond with a definite answer to whether the Department would comply with federal law prohibiting a major rule like this one from going into effect immediately:

> Will the Department guarantee that any rule concerning student loan repayment or debt relief published in the Federal Register between now and the expiration of the president's current term of office will not take effect before the statutory 30-day period has elapsed?
> *Id.* at 3.

94.     The Secretary refused to respond.

95.     Despite public silence, the Department's internal communications establish the truth.  Indeed, the Department has already pre-written the celebratory political emails it plans to send borrowers if it succeeds in implementing the Third Mass Cancellation Rule.  *See* Congratulations Form Email, attached hereto as Exhibit J.  The Department has instructed loan-

servicing organizations that, after cancelling loans, they must send these pre-written emails, which state at the very top of each email, "Congratulations! The Biden-Harris Administration has forgiven a portion of your federal student loan(s) listed below with [SERVICER NAME]." *Id.* at 1 (brackets in original).

96.     Through cloak and dagger, the Department has thus finalized a rule with a rollout plan that is maximally designed to forgive tens or hundreds of billions of dollars without any judicial review and is designed to boost the incumbent Democratic presidential candidate two months before the election.

## VI.     The Third Mass Cancellation Rule Irreparably Harms Plaintiff States.

### A.     The Third Mass Cancellation Rule harms a public instrumentality that services loans in Missouri.

97.     The States press several theories of standing, including one that is the same exact theory that prevailed in *Biden v. Nebraska* and again just last month in *Missouri v. Biden*.  .

98.     The Higher Education Loan Authority of the State of Missouri ("MOHELA") is "a public instrumentality and body corporate" of the State of Missouri that performs "an essential public function" by providing residents access to student loans.  Mo. Rev. Stat. § 173.360; *see also Biden*, 143 S. Ct. at 2366.

99.     Because it is a public instrumentality of Missouri, "harm to MOHELA is also a harm to Missouri." *Biden*, 143 S. Ct. at 2366.

100.     MOHELA's purpose is to ensure that all eligible post-secondary education students in Missouri have access to guaranteed student loans.  Since 2010, MOHELA has provided roughly $100 million in funding for college scholarships in the State of Missouri.  As of 2022, MOHELA "owns over $1 billion in FFELs"—that is, MOHELA owns asset-backed securities made up of student loans.  *Id.* at 2365.  As of 2022, "[i]t also services nearly $150 billion worth of federal

loans, having been hired by the Department of Education to collect payments and provide customer service to borrowers." *Id.* "MOHELA receives an administrative fee for each of the five million federal accounts it services, totaling $88.9 million in revenue [in 2022] alone." *Id.* "Its profits help fund education in Missouri: MOHELA has provided $230 million for development projects at Missouri colleges and universities and almost $300 million in grants and scholarships for Missouri students." *Id.*

101.    MOHELA is authorized to act as a servicer for student loan debt, see Mo. Rev. Stat. § 173.385.1(18), and it may use fees and charges from that activity "to pay the costs of the authority," § 173.385.1(12).

102.    MOHELA is a servicer for federally held student debt, including Direct Loan program loans, under contracts with the Education Department.  The amount of federally held student debt MOHELA services is substantial.  As of June 30, 2023, (the date of the most recent financial statement) the entity services roughly $344.4 billion in federal direct loans representing over 7.8 million accounts, which are primarily Direct Loans.  *See Financial Statements and Schedule of Expenditures of Federal Awards: Higher Education Loan Authority of the State of Missouri As of and for the Years Ended June 30, 2023 and 2022 With Reports of Independent Auditors* 4, MOHELA (2023) ("FY 2023 Financial Statement").[13]  Servicing revenue for fiscal year 2023 was $279.2 million.  *Id.* at 4.  By April 2024, MOHELA's federally-owned student loan portfolio had risen to over 8 million borrower accounts.  *See* Declaration of James Richard Kvaal, attached hereto as Exhibit K.

---

[13] Available at https://www.mohela.com/DL/common/publicInfo/financialStatements.aspx

103.    As a servicer of federally-owned student loans, MOHELA receives monthly income for each of the loans it services.  The value of a given loan is controlled by the Unified Servicing and Data Solutions (USDS) contract.

104.    And while much of what MOHELA does is service loans owned by the Federal Government, MOHELA also owns $874 million of legacy FFEL private loans.  *See* FY 2023 Financial Statement at 6, 8.  The entity generates revenue from those outstanding FFEL private loans.  *See Financial Statements: Higher Education Loan Authority of the State of Missouri As of and for the Years Ended June 30, 2021 and 2020 With Reports of Independent Auditors* 7, MOHELA (2021).[14]  Last year, MOHELA earned $51 million in interest revenue from these loans. *See* FY2023 Financial Statement at 14.

105.    The Third Mass Cancellation Rule harms MOHELA in at least four ways.

106.    First and most obvious, it imposes administrative costs on MOHELA.  The Change Request expressly acknowledges that the Third Mass Cancellation Rule will impose administrative costs, which the Federal Government says MOHELA must cover.  *E.g.*, Ex. D at 8.  This includes costs associated with the hiring and training of new call center representatives, at the direction of Defendants, to field calls starting September 9, 2024, about the Third Mass Cancellation Rule.  *See* July 9, 2024, Department Email, attached hereto as Exhibit L.  The States (on behalf of MOHELA) can thus sue because MOHELA would not have to expend these administrative costs but for the unlawful rule.

107.    Second, MOHELA faces the imminent loss of revenue in its role as a servicer of loans owned by the Federal Government.  MOHELA's revenue as a servicer of those loans is a function of the number of accounts it services.  "MOHELA receives an administrative fee for each

---

[14] *Id.*

of the five million federal accounts it services"—now more than 8 million loans as of April 2024. *See Biden*, 143 S. Ct. at 2366. The Supreme Court determined that MOHELA suffers financial harm whenever loans that it services are discharged. *Id.* So when student loan balances go to zero (as they will under the Third Mass Cancellation Rule), or when balances are decreased so that accounts are closed earlier than they would have closed (as they will be under the Third Mass Cancellation Rule), MOHELA loses revenue from servicing those loans. The Department has informed servicers that they will have three days to effectuate the forgiveness measures. *See* Ex. E. Thus, by accelerating the forgiveness timeline for the typical borrower by as much as 15 years or more, the Third Mass Cancellation Rule imposes financial harm on MOHELA, and thus the State of Missouri, by depriving MOHELA of years in servicing fees.

108. Third, MOHELA recently also became the servicer for FFEL private loans held by Navient (the successor of Sallie Mae). MOHELA earns administrative servicing fees by servicing these loans. MOHELA faces imminent loss of loan servicing revenue through this income stream due to the Third Mass Cancellation Rule's provisions waiving outstanding FFEL private loans *and* encouraging consolidation. Under the Third Mass Cancellation Rule, borrowers will refinance their FFEL private loans into Direct Loans. When they do so, the Navient loans will be discharged, and MOHELA will lose the stream of revenue it currently receives from servicing those loans.

109. Fourth, MOHELA also faces imminent future loss of revenue because, in addition to servicing FFEL private loans held by Navient, MOHELA holds nearly $1 billion in its own FFEL private loans.

110. The Third Mass Cancellation Rule drastically reduces the value of those assets by providing borrowers an enormous incentive to consolidate FFEL private loans into loans owned by the government and eligible for the new cancellation plan. Specifically, by including a

provision that allows for waiver of balances for consolidated loans that were previously FFEL loans, the Third Mass Cancellation Rule further induces borrowers to consolidate their legacy FFEL private loans away from MOHELA and into federal, consolidated Direct Loans.

111.    This is not conjecture or speculation, but the consistent reaction of borrowers each time Defendants have promulgated a new loan forgiveness rule over the last two and a half years. In 2022, when Defendants announced the HEROES Plan, consolidations of MOHELA loans spiked.  *See* MOHELA Monthly Consolidation Summary, attached hereto as Exhibit M.  That spike did not dissipate until December 2022, when the Supreme Court declined to lift the Eighth Circuit's injunction against the plan.  *Id.*  MOHELA saw another spike around late January 2024, when Defendants announced they would begin forgiving loans under the SAVE Plan.  *Id.* Refinancing of MOHELA loans more than tripled in February compared to December.  *Id.*

112.    The Federal Government in fact expressly tells borrowers to consolidate to obtain the benefits of their attempts to mass cancel loans.  *E.g.*, Federal Student Aid, Department of Education, *What to Know About Federal Family Education Loan (FFEL) Program Loans* (last visited August 22, 2024)[15] (encouraging borrowers to consolidate because "if your loan isn't held by ED [Department of Education], you won't be able to qualify for some federal student loan relief programs unless you consolidate into a Direct Consolidation Loan.")

113.    By inducing consolidation of FFEL private loans, the Third Mass Cancellation Rule harms MOHELA because if a borrower consolidates a FFEL private loan to take advantage of the Third Mass Cancellation Rule's balance or interest forgiveness, MOHELA will no longer own that loan.  MOHELA will thus lose its ability to earn interest income generated by the FFEL private

---

[15] https://studentaid.gov/articles/what-to-know-about-ffel-loans/

assets that it owned.  That threatens the $51 million stream of interest revenue that MOHELA currently receives.  *See* MOHELA FY 2023 Financial Statement at 7, 14.

114.    The Third Mass Cancellation Rule impairs MOHELA's ability to provide services to Missouri residents, and harms Missouri's interest in ensuring its citizens receive an education. *See* Mo. Const. art. IX, § 9(b) ("The general assembly shall adequately maintain the state university and such other educational institutions as it may deem necessary.").

**B. The Third Mass Cancellation Rule Directly Harms the Business of the State of North Dakota.**

115.    The State of North Dakota is engaged in the business of banking "[f]or the purpose of encouraging and promoting agriculture, commerce, and industry."  N.D.C.C. § 6-09-01.  For that purpose, North Dakota "maintain[s] a system of banking owned, controlled, and operated by it, under the name of the Bank of North Dakota."  *Id.*  Much like MOHELA is a public instrumentality of Missouri, the Bank of North Dakota is a public instrumentality of North Dakota.

116.    In this capacity, the Bank of North Dakota funds and administers a state-sponsored student loan program and a student loan consolidation program.  *See* N.D.C.C. ch. 15-62.1.  The Bank of North Dakota's student loan offerings include the "Dakota Education Alternative Loan" or "DEAL" program for eligible borrowers attending institutions of higher education in North Dakota.  *See* Bank of North Dakota, *DEAL Student Loan* (last visited Aug. 27, 2024).[16]  Interest earned by the Bank of North Dakota from student loans is used to implement, maintain, and administer state programs.  *See* N.D.C.C. §§ 15-62.1-01; 15-62.1-05.

117.    The Bank of North Dakota enables borrowers who have taken out federal student loans to refinance their loans as State-financed student loans when the Bank is able to offer rates

---

[16] https://bnd.nd.gov/education-funding/apply-for-student-loan/deal-student-loan/

lower than what the Federal Government is able to authorize.  About 16,000 borrowers have refinanced their federal student loans into North Dakota-financed student loans because the Bank has been able to provide better terms.

118.    But under the Third Mass Cancellation Rule, student loan recipients that received or consolidated their student loans through the Bank of North Dakota will not be eligible to have their loans absolved or their interest waived.  Consequently, despite the Bank's ability to offer more competitive rates and the convenience of the Bank working directly with in-state post-secondary institutions, the Third Mass Cancellation Rule will foreseeably cause many would-be student loan borrowers to forego borrowing from the Bank of North Dakota in the future if loans issued by the federal government may systematically no longer repayment under their terms.

119.    Since the Bank of North Dakota's student loan program is the State of North Dakota engaged in business, harms to the Bank of North Dakota or its student loan programs are direct harms to the State of North Dakota itself.  *See Louisiana Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998) (a party "suffer[s] constitutional injury in fact when agencies lift regulatory restrictions on their competitors").

**C.  The Third Mass Cancellation Rule Harms State Revenue.**

120.    Plaintiff States will face financial harm from implementation of the Third Mass Cancellation Rule.  Under tax law in Georgia, Missouri, North Dakota, and Ohio, an individual's taxable state income is based on their federal taxable income or federal adjusted gross income ("AGI") as a baseline.  *See* O.C.G.A. § 48-7-27(a); Mo. Rev. Stat. § 143.121; N.D.C.C. § 57-38-30.3(2); O.R.C. § 5747.01.  Similarly, Alabama tax law provides that gross income for an individual does not include "[i]ncome from discharge of indebtedness to the extent allowed by 26 U.S.C. 108." Ala. Code § 40-18-14(a)(3)h.  While the determination of federal taxable normally

includes student loan discharge, *see* 26 U.S.C. § 61(a)(11), that input was removed under the American Rescue Plan Act of 2021 for student loan debt discharged before January 1, 2026, *see* 26 U.S.C. § 108(f)(5).  Thus, the discharge of indebtedness—via blanket interest payment waivers and loan discharge—will not be taxed in 2024 or 2025.

121.    But for the Third Mass Cancellation Rule, significant numbers of federal loan cancellations would occur after 2026 and would result in taxable income being recognized from the loan forgiveness and thus increased payments of income taxes to Missouri.

122.    Plaintiff States also face a separate sovereign injury from the Third Mass Cancellation Rule, as a result of having to either accept the lost tax revenues identified above or change state tax law for the determination of an individual's taxable state income.

**VII.    The Department has engaged in final agency action.**

123.    Just like when the States sued to challenge the HEROES Plan before formal publication, the Department's actions here are "final agency action" subject to challenge under the APA.  5 U.S.C. § 706.

124.    The Supreme Court "has consistently taken a 'pragmatic' and 'flexible' approach to the question of finality."  *Hawkes Co. v. U.S. Army Corps of Eng'rs*, 782 F.3d 994, 997 n.1 (8th Cir. 2015).  To be final, an agency's action must meet two requirements. "First, the action must mark the 'consummation' of the agency's decisionmaking process." *Bennet v. Spear*, 520 U.S. 154, 177–78 (1997) (citation omitted).  "And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id*. at 178 (citation omitted).  Both are met here.

125.    The Third Mass Cancellation Rule marks the end of the decisionmaking process. As revealed by the "Change Request" document that the Secretary already sent (surreptitiously) to

federal contractors, Defendants are demanding that federal contractors begin forgiving loans "immediately" after receiving the "forgiveness files," which will occur as early as September 3. There is nothing tentative about the Department's demands.  What matters is that the critical aspects of the Third Mass Cancellation Rule—amounts, program contours, and timeline—will not change.

126.    Indeed, these details have long been set in stone.  The Secretary initially sent a Change Request form dated May 31, 2024 with an "anticipated implementation date" of September 1.  Then on June 18, the Secretary sent a revised attachment to the Change Request form (included in the exhibit) that made clear the implementation date was no longer "anticipated."  Ex. F at 2 ("Implementation Date: 9/1/2024").

127.    The Third Mass Cancellation Rule also has "determined rights [and] obligations." *Sackett v. EPA*, 566 U.S. 120, 126 (2012) (quotations marks omitted).  It determines the rights of millions of student-loan borrowers and organizations like MOHELA, and legal consequences will flow from it.

128.    Just like a decision binding agency staff to discontinue a program was "final agency action under the APA." *Biden v. Texas*, 142 S. Ct. 2528, 2545 (2022), Defendants' decision here to mass cancel tens or hundreds of billions of dollars in student loans is final agency action.

129.    Indeed, it is final agency action of the worst kind because Defendants are taking this action surreptitiously to try to mass forgive loans before any opportunity for judicial review.

### CLAIMS FOR RELIEF

### COUNT I – Violation of Administrative Procedures Act
**Agency Action in Excess of Statutory Jurisdiction and in Violation of Separation of Powers
U.S. Const. art. I, § 1**

### Major Questions Doctrine

130.    Plaintiffs re-allege all paragraphs above as if fully set out herein.

131.    The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law."  5 U.S.C. § 706(2)(A)-(D).

132.    The Department is an "agency" under the APA.  *Id*. § 701(b)(1).

133.    The Third Mass Cancellation Rule is a "rule[]" under the APA.  *Id*. § 701(b)(2).

134.    The Third Mass Cancellation Rule is final agency action subject to judicial review. *Id*. § 704.

135.    Separation-of-powers principles prohibit an agency from deciding an issue of great economic or political significance, or issues traditionally governed by state or local law, absent clear authorization from Congress to do so, under what Courts have recognized as the "major questions doctrine."  *West Virginia*, 597 U.S. at 724 (discussing the "major questions doctrine").

136.    The major questions doctrine is triggered when an agency attempts to seize broad authority over matters of great economic and political significance.  *See id*. at 721-22.

137.    The Third Mass Cancellation Rule concerns matters of vast political significance and salience because its provisions and outcomes relate to issues subject to earnest and profound debate in the American body politic for several decades where Congress has actively legislated. *See* Ian Krietzberg, *Key events on the path to student loan forgiveness, from Occupy Wall Street to the 2020 presidential primaries*, CNBC (Aug. 24, 2022);[17] *see also Biden*, 143 S. Ct. at 2374 ("A decision of such magnitude and consequence on a matter of earnest and profound debate across the country must rest with Congress itself, or an agency acting pursuant to a clear delegation from

---

[17] https://www.cnbc.com/2022/08/24/timeline-key-events-on-the-path-to-student-loan-forgiveness.html

that representative body.") (citing *West Virginia*, 597 U.S. at 735) (cleaned up).  Indeed, the Third

Mass Cancellation Rule involves the same exact matter of political significance as in *Biden v.*

*Nebraska*.

138.    The Third Mass Cancellation Rule also concerns matters of great economic

significance because it is expected to cost at least $146.9 billion.  That number is more than

sufficient to trigger the major questions doctrine.  *See Alabama Ass'n of Realtors*, 141 S. Ct. at

2489 ($50 billion triggered major questions doctrine).  In both the HEROES Rule and SAVE Rule,

independent observers calculated that the Department's financial projections fell short by a factor

of three.  Applied here, the true cost of this Rule would extend upwards of $450 billion.  And that

is an underestimate.  Indeed, given Defendants' plan to use this Third Mass Cancellation Rule as

an end-run around the SAVE Plan injunction, it could cost as much as $475 billion more than

Defendants' estimate.

139.    Where a rule triggers the major questions doctrine, the Government must identify

"exceedingly clear language" authorizing the grant of authority.  *Alabama Ass'n of Realtors*, 594

U.S., at 764.; *see also Missouri v. Biden*, Nos. 24-2332 & 24-2351, *Order* (Aug. 9, 2024) ("In light

of this vast assertion of newfound power, the major-questions doctrine requires that 'something

more than a merely plausible textual basis for the agency action is necessary' in order to uphold

the regulation." (citing *West Virginia v. EPA*, 597 U.S. 697, 723 (2022)).  Defendants cannot do

so.

140.    The Third Mass Cancellation Rule applies an unprecedented interpretation of

Sections 432(a)(6) and 451(b)(2) of the HEA, by asserting that section 432(a)(6) authorizes the

Secretary to waive Direct Loan borrowers' balances and interest at his sole discretion through

Section 451(b)(2).

141.    Section 432(a)(6) provides that, "in the performance of, and with respect to, the functions, powers and duties, vested in him by this part, the Secretary may enforce, pay, compromise, waive, or release any right, title, claim, lien, or demand, however acquired, including any equity or any right of redemption" with respect to the FFEL program.  20 U.S.C. § 1082(a)(6).

142.    This language is similar to the "waive or modify" language from the HEROES Act that the Supreme Court already held was not specific enough to justify a program like this.  For that reason alone, this program is unlawful.

143.    In any event, section 432(a) does not even apply to the Direct Loan program.  The Secretary tries to incorporate section 432(a) through Section 451(b)(2), which provides that "[n]otwithstanding any other provision of this part, loans made to borrowers under this part that, except as otherwise specified in this part, have the same terms, conditions, and benefits as loans made to borrowers under *section 428*," *not* section 432, "shall be known as 'Federal Direct Stafford/Ford Loans'."  20 U.S.C. § 1087a(b)(2) (emphasis added).

144.    Defendants' reliance on this statute fails for two reasons.  First, this section incorporates Section 428, not section 432.  Second, the provision does not even say that Direct Loans *shall* have the same terms and conditions as loans under section 428.  Instead, it says *if* loans have those same terms, they shall be named "Federal Direct Stafford/Ford Loans."

145.    Had Congress wanted to incorporate "waiver" language into Part D, it certainly knew how to do so.  When Congress enacted the Perkins Loan program six years before the Direct Loan program, it authorized the Secretary "to enforce, pay, compromise, waive, or release any right, title, claim, lien, or demand, however, acquired, including any equity or any right of redemption."  20 U.S.C. § 1087hh(2).  Moreover, subsection (3) of the same *explicitly* references back 20 U.S.C. § 1082 in the FFEL program.

146. Before this Rule, the Defendants had never before interpreted Section 451(b)(2) to incorporate section 432(a)(6) into the Federal Direct Loan program in any rulemaking. To the contrary, in 2021, the Department expressly disclaimed the interpretation that Defendants press here. *See* Ex. A, Reed Rubinstein memorandum. By definition, there can be no "exceedingly clear language" authorizing a program if the Department itself has expressly disclaimed that interpretation—much less if the Department, the President, former Speaker Pelosi, and Congress are all on record rejecting this interpretation.

147. Defendants' interpretation would grant the Secretary unbridled authority to "pay, compromise, waive, or release" every penny of every loan in the any and all loans in the Federal Direct Loan program, an unlimited grant beyond anything ever practiced or professed by the Department.

148. Worse yet, Defendants' interpretation relies on a two-step inference that *explicitly* refers to "terms, conditions, and benefits" in section 428, *not* 432 as Defendants imply.

149. There is no "exceedingly clear language" granting the Secretary to waive student loan debts in the federal Direct Loan program.

150. Separately, the Third Mass Cancellation Rule asserts that the Secretary can, at his sole discretion, disregard the joint Department of Treasury and Department of Justice FCCS regulatory scheme governing federal "compromise authority." *Id.* at 27,613. But Defendants' cannot identify "exceedingly clear language" granting this discretion either.

151. To the contrary, both 31 C.F.R. § 902 and 31 U.S.C. § 3711 place clear guardrails on instances when an agency may exercise "compromise authority" over debts owed to the agency. The FCCS provide that a government agency may only compromise a debt of under $100,000 where the agency establishes that it "cannot collect the full amount because (1) The debtor is

unable to pay the full amount in a reasonable time, as verified through credit reports or other financial information; (2) The Government is unable to collect the debt in full within a reasonable time by enforced collection proceedings; (3) The cost of collecting the debt does not justify the enforced collection of the full amount; or (4) There is significant doubt concerning the Government's ability to prove its case in court."  31 C.F.R. § 902.  Those are individualized determinations, not amenable to classwide waiver powers.

152.    Moreover, the statute authorizing the FCCS, § 3711, also states that "The head of an executive . . . agency (1) *shall* try to collect a claim of the United States Government for money . . . arising out of the activities of, or referred to, the agency."  31 U.S.C. § 3711.  Yet, the Defendants' Third Mass Cancellation Rule authorizes the Secretary to dismiss the statute and grant broad waivers without any attempt to collect the claim on that money.

153.    Departure from longstanding practice without new authorization from Congress is strong evidence the agency is acting without Congressional authorization.  *See Nat'l Fed'n Indp. Bus. v. Dep't of Labor*, 595 U.S. 109, 117 (2022).  All of Defendants' key interpretations—Sections 432(a)(6) and 451(b)(2) of the HEA, and 31 C.F.R. § 902—lead to new practices never before implemented by the Federal Government.  Section 432(a)(6) has never been used as a grant for unlimited mass student loan waivers, and the Department has always *required* that the Secretary follow 31 C.F.R. § 902.

154.    The Third Mass Cancellation Rule triggers the major questions doctrine and violates principles of separation of powers by seizing broad authority over matters of great economic and political significance without clear congressional authorization.

155.    Even if the Third Mass Cancellation Rule does not implicate the major questions doctrine, it still violates separate of powers.  Congress only gave the Department authority to

cancel student loans in very "limited circumstances."  *See Biden*, 143 S. Ct. at 2362–63.  This is not one of them.

156.    And while Congress is no doubt aware of the issue, it has chosen not to rewrite the HEA by adding a new category of loan forgiveness as the Department has unilaterally done.  By doing so unilaterally, Defendants have "seiz[ed] the power of the Legislature."  *Id.* at 2373.

157.    The Department therefore has no authorization to forgive student loans—whether balances or interest—in this context, and the Department exceeded its authority when it issued the Third Mass Cancellation Rule.  Because the Final violates separation of powers, it should be set aside.

### COUNT II – Violation of the Administrative Procedures Act
### Agency Action in Excess of Statutory Authority (5 U.S.C. § 706(2)(C))

158.    Plaintiffs re-allege all paragraphs above as if fully set out herein.

159.    The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . (A) . . . not in accordance with law; . . . [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2).

160.    The Third Mass Cancellation Rule is contrary to law and exceeds the Department's statutory authority.

161.    *First*, section 432(a) does not authorize the Secretary to waive loans or interest in the Direct Loan program.  In fact, the Secretary recognizes that his textual hook is so weak that he feels forced to resort to "legislative history."  89 Fed. Reg. 27,566 n.4.

162.    Section 432(a), 20 U.S.C. § 1082(a), provides for the Secretary's "General Powers" under the FFEL private loan program.  Under subsection (a)(6), "with respect to, the functions, powers, and duties, vested in him," the Secretary is authorized to "enforce, pay, compromise,

waive, or release any right, title, claim, lien, or demand, however acquired, including any equity or any right of redemption."  20 U.S.C. § 1082(a)(6).

163.    The federal Direct Loan program does not have a parallel provision.  Instead, the Third Mass Cancellation Rule asserts that section 432(a)(6) can be imputed into the Direct Loan program though Section 451(b)(2) of the HEA.  But section 451(b)(2), on its own terms, specifically, and *only*, refers to section 428, not section 432.  *See* 20 U.S.C. § 1087a(b)(2) ("loans made to borrowers under this part that, except as otherwise specified in this part, have the same terms, conditions, and benefits as loans made to borrowers under section 428.").

164.    Even then, Section 451 does not even incorporate any other section. It just says that *if* a loan includes certain terms, then the loan shall be described as a Direct Loan.

165.    Moreover, the language of Section 432(a) is clear that any power to "compromise, waive, or release" a claim is cabined in a requirement that such an action be "with respect to, the functions, powers, and duties, vested in him."  To the extent that the Secretary has any power to "compromise, waive, or release" student debt, he may only do so when Congress has given him a specific power or duty to do so.  No such authorization exists here.

166.    The Third Mass Cancellation Rule ignores these clear limitations, and instead asserts that "compromise, waive, or release" language provides the Secretary to "waive all or part of any loan."  This broad interpretation is contradicted by the Supreme Court's ruling in *Biden v. Nebraska,* where the Court held that similar "waive" language in the HEROES Act did not authorize the Secretary to "rewrite that statute from the ground up."  *Biden v. Nebraska*, 143 S. Ct. 2355, 2368, (2023).  But that is exactly what the Third Mass Cancellation Rule attempts to do here.

167.    "Congress opted to make debt forgiveness available only in a few particular exigent circumstances; the power to modify does not permit the Secretary to 'convert that approach into

its opposite' by creating a new program affecting 43 million Americans and $430 billion in federal debt." *Id.* at 2370 (citing *Descamps v. United States*, 570 U.S. 254, 274 (2013)).  Similarly here, the power to waive, even if it exists in the Direct Loan program, does not permit the Secretary to craft a new forgiveness program affecting about 27.6 million borrowers and at least $150 billion.

168.    *Second*, the Third Mass Cancellation Rule is in excess of statutory authority because 31 U.S.C. § 3711 and 31 C.F.R. § 902 are binding on the Secretary, and the new rule disclaims that requirement.  Section 3711 requires the Secretary "try to collect a claim of the United States Government for money . . . arising out of the activities of, or referred to the agency," and requires he "act[] under . . . standards that the Attorney General, the Secretary of the Treasury, may prescribe."  31 U.S.C. §§ 3711(a)(1), (d)(2).  The Attorney General and Secretary of the Treasury's standards are set forth in 31 C.F.R. § 902.  That regulation prescribes that the Secretary may only compromise a debt in certain circumstances.  *See infra* ¶¶ 151–52.

169.    The provisions of the new rule exceed those circumstances, and instead proclaim authority for broad-based compromises on any and all student loan balances.

170.    *Third*, the Congressional Review Act (CRA) requires that "[b]efore a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress . . . containing (i) a copy of the rule; (ii) a concise general statement relating to the rule, including whether it is a major rule; and (iii) the proposed effective date of the rule."  5 U.S.C. § 801(a)(1)(A).  The CRA further provides that "[a] major rule . . . shall take effect on the latest of—(A) the later of the date occurring 60 days after the date on which—(i) the Congress receives the report submitted under paragraph (1); or (ii) the rule is published in the Federal Register."  *Id.* § 801(a)(3).

171.    Though the Third Mass Cancellation Rule was designated as "major,"[18] Defendants have taken affirmative steps to implement the Third well in advance of that statutory obligation. Specifically, Defendants have instructed MOHELA (and presumably all servicers), that they must provide certain data about borrowers to Defendants between September 2–5, and must be ready to implement the Third Mass Cancellation Rule's provisions "immediately" after Defendants return to the servicers "forgiveness files."  Implementation of the Third Mass Cancellation Rule before the CRA's mandated 60-day waiting period is in violation of the CRA and in excess of Defendants statutory authority.

172.    The CRA includes exceptions that permit implementation earlier than 60 days, but none of these apply.  These apply only if a rule is "necessary because of an imminent threat to health or safety or other emergency," "necessary for the enforcement of criminal laws," "necessary for national security," or "issued pursuant to any statute implementing an international trade agreement."  5 U.S.C. § 801(c)(2).  None of these exceptions even plausibly applies.

173.    The provision barring judicial review of the CRA does not apply.  While the CRA does not permit review of a "determination, finding, action, or omission," 5 U.S.C. § 805, that only applies to actions *by Congress*.  "Congress only intended to preclude judicial review of *Congress'* own determinations, findings, actions, or omissions made under the CRA after a rule has been submitted to it for review."  *United States v. S. Indiana Gas and Elec. Co*., No. IP99-1692CMS, 2002 WL 31427523, at *5 (S.D. Ind. Oct. 24, 2002) (emphasis added); *see also Tugaw Ranches, LLC v. U.S. Dep't. of the Int*., 362 F. Supp. 3d 879, 889 (D. Idaho 2019) (adopting the *S. Indiana* analysis); *NRDC v. Abraham*, 355 F.3d 179, 201–02 (2d Cir. 2004) (enforcing the 60-day deadline); *Liesegang v. Sec'y of Veterans Affairs*, 312 F.3d 1368, 1376 (Fed. Cir. 2002) (similar).

---

[18] https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202404&RIN=1840-AD93

174.   Even if § 805 were interpreted to apply to findings of agencies, not just of Congress, Defendants have already made the relevant findings to trigger the CRA.  Section 805 "in no way prohibits a court from determining whether a rule is in effect."  *Tugaw Ranches*, 362 F. Supp. 3d at 887 (emphasis and citation omitted).  "Instead, Congress 'expect[s] that a court might recognize that a rule has no legal effect due to the operation of subsections 801(a)(1)(A) or 801(a)(3).'"  *Id.* (citation omitted).  Here, it is unlawful to implement the Third Mass Cancellation Rule because it cannot go into effect for 60 days.

175.   *Fourth*, the HEA requires that regulations affecting programs under title IV of the HEA be published in final form by November 1 prior to the start of the award year—July 1 of the following calendar.  *See* 20 U.S.C. § 1089(c)(1).  The HEA provides the Secretary with discretion to "designate any regulatory provision that affects the programs under this subchapter and is published in final form after November 1 as one that *an entity subject to the provision* may, in the entity's discretion, choose to implement prior to the effective date in [section 1089(c)(1)]."  *Id.* § 1089(c)(2)(A) (emphasis added).

176.   Based on the timing of publication, the Third Mass Cancellation Rule is required by § 1089(c)(1) to be implemented on July 1, 2025, absent a designation of early implementation. Defendants plan to implement the Third Mass Cancellation Rule immediately, well in advance of the July 1, 2025, statutory requirement, by designating the whole Rule for early implementation. But the Secretary and the Department are not "entit[ies]" for purposes of the HEA—or at least they are not the only entities.

177.   Under the plain text of the statute, entities like MOHELA have "discretion" not to implement any of these terms before July 1, 2024, but the Secretary has unlawfully demanded that the servicing companies do so immediately.  For example, the Change Request form demands that

servicing organizations "*shall* begin processing the Measure 1 forgiveness file *immediately* upon receipt" of "forgiveness files" from the Department and "*shall* complete all Measure 1 forgiveness processing, to include sending borrower notifications, within 10 business days" after receipt.  Ex. D at 4 (emphasis added).

178.    The Secretary cannot grant himself discretion in excess of that authorized under the HEA, and he cannot divest organizations like MOHELA of the discretion they have under that statute.  He cannot purport to force them to comply with a  rule before July 1 of the following year.

179.    The Third Mass Cancellation Rule is contrary to the HEA.  It should be set aside.

180.    *Fifth*, the Secretary tries to use the phrase "same terms, conditions, and benefits" to justify this new mass forgiveness plan.  But even if the Secretary had authority to mass cancel FFEL private loans (he does not), "the Secretary's general power to compromise or waive claims under the FFEL program is neither a term nor a condition nor a benefit of FFEL program loans." Ex. A, at 4.

181.    A "term" is defined as "[w]ord, phrase, or condition in a contract, instrument, or agreement which relates to a particular matter."  Term, *Black's Law Dictionary* (6th ed. 1990).

182.    A "condition" is defined as "[a] clause in a contract or agreement which has for its object to suspend, rescind, or modify the principal obligation."  Condition, *Black's Law Dictionary* (6th ed. 1990).

183.    A "benefit" in contract is defined as "advantages which result to either party from performance by other." Benefit, *Black's Law Dictionary* (6th ed. 1990).

184.    Each part of "terms, conditions, and benefits" concerns provisions within the four corners of a contractual obligation between the student loan borrower and the lender.  The

Secretary's general authority is not a "term," "condition," or "benefit" of an individual loan, and to interpret this phrase as such would stretch its meaning well beyond reasonable bounds.

### COUNT III Violation of the Administrative Procedures Act
### Arbitrary and Capricious Agency Action (5 U.S.C. § 706(2)(A))

185.    Plaintiffs re-allege all paragraphs above as if fully set out herein.

186.    The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . (A) arbitrary, capricious, [or] an abuse of discretion"  5 U.S.C. § 706(2)(A).

187.    "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained."  *Fed. Commun. Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

188.    The Third Mass Cancellation Rule is arbitrary and capricious for several reasons.

189.    *First*, the Third Mass Cancellation Rule is an attempt at an end-run around the Eighth Circuit's injunction against the SAVE Plan.  That injunction bars Defendants from implementing the SAVE Plan for individuals wholly or partly enrolled in that program.  *Missouri*, 2024 WL 3738157.  Three different courts have ruled that the SAVE Plan is unlawful.  Yet Defendants are trying to use the Third Mass Cancellation Rule to give individuals who are *not* enrolled in the SAVE Plan the benefits of that Plan even though the Plan is already enjoined for everybody who *is* enrolled in it.

190.    *Second*, even if the Congressional Review Act's 60-day deadline is not enforceable under that Act, it is arbitrary and capricious for Defendants to surreptitiously design this program in a way maximally calculated to evade judicial review.  There is no plausible emergency or anything else that would require the Secretary to deviate from the ordinary norm of not implementing any rule until at least 30 to 60 days after publication.  This is the *third* attempt

Defendants have made at mass cancellation.  There is no actual urgency, only an urgency in trying to forgive as much debt as possible as quickly as possible because they know "the States cannot turn back the clock on any loans that have already been forgiven." *Missouri*, 2024 WL 3738157, at *4.

191.     *Third*, the Third Mass Cancellation Rule fails to capture, account for, or report the full cost of its implementation.  The Third Mass Cancellation Rule is estimated the provisions would cost $146.9 billion.  This estimate, however, is based on the Defendants' assumption that they would prevail in *Missouri v. Biden* and *Alaska v. Department of Education* and the SAVE plan would be implemented.  Because the SAVE plan remains fully enjoined, and Defendants are prohibited from further forgiving loans under many income-driven (IDR) plans, the universe of borrowers for which this Rule applies is now significantly higher.

192.     Particularly, where Defendants are now enjoined from implementing their unlawful SAVE Plan forgiveness, borrowers with undergraduate loans dating back before July 1, 2005, and post-graduate loans date back before July 1, 2000, who are on the SAVE plan would now be eligible for full forgiveness under this plan.  The cost estimates within the Third Mass Cancellation Rule do not account for this change, and thus seriously underestimate the total cost of the Third Mass Cancellation Rule.

193.     Worse yet, the Third Mass Cancellation Rule is being implemented *after* two district courts and the Eighth Circuit enjoined the SAVE rule.  The Defendants were thus on full notice that their cost estimates were least woefully inadequate, and at worst deliberate fabrications.  For example, in a bit of accounting sleight of hand, Defendants have admitted that borrowers who were expected to receive forgiveness under the SAVE Rule, and who would also receive waivers under this plan were "not assign[ed] a cost to the waivers."  *See* 89 Fed. Reg. 27,605.  In other

words, where the vast majority of borrowers under the SAVE Rule were expected to receive forgiveness, the Third Mass Cancellation Rule does not consider any waivers for those borrowers as a cost. That *drastically* undercounts the current costs of this program, considering Defendants efforts toward immediate implementation of these waiver provisions. Moreover, where the SAVE Rule has been enjoined, all of those waiver costs should have been considered primary costs of this rulemaking and thus included in the estimated figures.

194.    By relying on an assumption that had already been publicly and saliently proven false, the Department's cost calculation was by definition unreasonable. This is a violation of Defendants' statutory duty to "reasonably explain" the Third Mass Cancellation Rule. *See Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 343-344 (D.C. Cir. 2019). When the SAVE Rule was enjoined, the Third Mass Cancellation Rule's estimated costs calculation became entirely untethered to reality.

195.    *Fourth*, the Third Mass Cancellation Rule is arbitrary and capricious because it did not consider States' financial interest on tax revenue from loan forgiveness.

196.    Generally, "forgiveness" of student loans is considered taxable income under by the Internal Revenue Service. The exception is for borrowers in the Public Service Loan Forgiveness program.

197.    Many States, including Missouri, follow the federal definitions when defining income tax for state purposes, which normally includes student loan discharge. Therefore, interest waivers and balance discharges are "forgiveness" and taxable income at the state level for borrowers in many States.

198.    The American Rescue Plan Act of 2021, however, removed student loan discharge as an income for purposes of federal AGI through December 31, 2025. *See* 26 U.S.C. § 108(f)(5).

199.    Despite being aware of this law, the Third Mass Cancellation Rule will waive—*i.e.* forgive—hundreds of millions of dollars of loan balances immediately following the Third Mass Cancellation Rule's publication, and before the end of this calendar year.  Few, if any, of those loans would have been forgiven before December 31, 2025, absent the Third Mass Cancellation Rule's waiver provisions.  This immediate forgiveness deprives States of tax revenue.

200.    *Fifth*, the Third Mass Cancellation Rule is arbitrary and capricious because it changes course from decades of Department practice on loan authority.  Never before has the Secretary claimed authority to "waive all or part of any loan" in the possession of the Department.  This new interpretation—which claims unbridled authority to waive every penny of every loan held by the Department—is a huge change of course.

201.    Indeed, if Congress had already authorized the Secretary to "waive all or part of any loan," there would have been no need for Congress to enact the HEROES Act in 2001, authorizing the Secretary to "waive or modify" loan provisions following 9/11.  The need to legislate authority for the specific disclaims any interpretation that authority already existed for the general.

202.    The Department has not only changed course without explanation but is wrongly denying changing course at all.  The Department claims it "has historically viewed its waiver authority as permitting the Secretary to waive the Department's right to require repayment of a debt when doing so advances the goals of the title IV programs and function."  89 Fed. Reg. 27, 567.

203.    However, this is the first time that the Department or Secretary has attempted to interpret sections 432(a)(6) of the FFEL program as applying to the Direct Loan program through section 451(b)(2), and purported authority to use section 432(a)(6) to "waive all or part of any

loan" held by the Department.  This is a massive change of course that the Department refuses to acknowledge.

204.    The Department also refuses to acknowledge its previous interpretations.  "[U]nexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice."  *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (internal quotation marks omitted).  In 2021, the Department recognized that "the Secretary does not have the statutory authority to cancel, compromise, discharge, or forgive, on a blanket or mass basis, principal balances of student loans, and/or to materially modify the repayment amounts or terms thereof." Ex. A, at 1.  Yet now it claims exactly that authority.

205.    *Sixth*, the Third Mass Cancellation Rule is arbitrary and capricious because it failed to consider meaningfully the inflationary effects of the Third Mass Cancellation Rule, both specifically in the secondary education market and more generally for the entire U.S. economy. The enormous inflationary pressures are an "important aspect of the problem" that Defendants were obliged to evaluate.  *Michigan v. EPA*, 576 U.S. 743, 750-52 (2015)) (cleaned up).  They failed to do so and thereby violated the APA.

206.    This Rule is not the product of a well-reasoned decision, but rather a pretext to evade well-considered federal court decisions.

207.    At the very least, the constitutional avoidance canon requires rejecting the Secretary's assertion of limitless authority.  As the Rubinstein memo puts it, "it is impossible to escape the conclusion that Congress funds student loans with the expectation that such loans will be repaid in full with interest, except in identified circumstances." Ex. A, at 6.  The Take Care Clause in the Constitution "necessarily serves to limit the exercise of the Attorney General's

settlement authority so that it does not become a dispensing power."  *Id.* at 7 (quoting an opinion of the Federal Government's Office of Legal Counsel).  So too with the Secretary.

208.    For all these reasons, the Third Mass Cancellation Rule is arbitrary and capricious and must be vacated.

### COUNT IV  Violation of the Administrative Procedures Act
### Agency Action in Violation of Statutory Procedures (5 U.S.C. § 706(2)(D)

209.    Plaintiffs re-allege all paragraphs above as if fully set out herein.

210.    The APA provides that courts must "hold unlawful and set aside agency action" that is "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

211.    The APA requires agencies to publish notice of all "proposed rule making" in the Federal Register, *id.* § 553(b), and to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments," *id.* § 553(c).  The Third Mass Cancellation Rule, therefore, only can be issued, if at all, pursuant to notice-and-comment rulemaking under the APA.  5 U.S.C. § 553.

212.    Here, when the Third Mass Cancellation Rule was proposed, the comment period was limited to the minimum thirty days.  This limited time period violated the APA.

213.    The Third Mass Cancellation Rule is not an interpretive rule, general statement of policy, nor is it a rule of agency organization, procedure, or practice otherwise exempt from notice-and-comment rulemaking.  Instead, the Third Mass Cancellation Rule is a substantive rule for APA purposes.  *See* 5 U.S.C. § 551(4)–(5).  Further, it is a final rule because it represents the culmination of the agency's consideration and affects rights and obligations.  *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

214.    "[A] thirty-day period is, in the Administrative Conference's view, 'an inadequate time to allow people to respond to proposals *that are complex* or based on scientific or technical

46

data.'   The Administrative Conference itself thus suggests 'a sixty-day period as a more reasonable *minimum* time for comment.'"   *Petry v. Block*, 737 F.2d 1193, 1201 (D.C. Cir. 1984) (cleaned up) (emphasis added) (citation omitted).

215.   Executive Orders 12866 and 13563 both state that comment periods should generally be at least 60 days.   *See* 58 Fed. Reg. 51735 (Sept. 30, 1995) ("[E]ach agency should afford the public a meaningful opportunity to comment on any proposed regulation, which in most cases should include a comment period of *not less than* 60 days." (emphasis added)); 76 Fed. Reg. 3821–22 (Jan. 21, 2011) ("To the extent feasible and permitted by law, each agency shall afford the public a meaningful opportunity to comment through the Internet on any proposed regulation, with a comment period that should generally be at least 60 days." (emphasis added)).   The proposed rule asks for the public's help in "complying with the specific requirements of Executive Orders 12866, 13563, and 14094 and their overall requirement of reducing regulatory burden that might result from these proposed regulations."   88 Fed. Reg. 1,895.

216.   For these reasons, most other agencies routinely provide at least sixty days of commenting for major rules.

217.   Providing only thirty days for commenting on a rule with such political and economic significance such as this one is entirely inappropriate—and for which the Department offered no meaningful explanation.

218.   Here the Third Mass Cancellation Rule is both complex and enormously impactful—tens or hundreds of billions of dollars turn on each of its major parameters.

219.   In these circumstances, Defendants violated the APA by only providing thirty days for comment.

220.    This error was prejudicial and denied the public (including Plaintiffs) an adequate opportunity to comment on the proposed rule.

## PRAYER FOR RELIEF AND DEMAND FOR JUDGMENT

Plaintiff States respectfully request this Court:

a.    issue an order and judgment declaring that the Third Mass Cancellation Rule violates the separation of powers established by the U.S. Constitution;

b.    issue an order and judgment declaring that the Third Mass Cancellation Rule violates the APA because it is contrary to law, is in excess of statutory authority, is arbitrary and capricious, is an abuse of discretion, and is without observance of procedure required by law;

c.    temporarily restrain, preliminarily enjoin, and permanently enjoin implementation and enforcement of the Third Mass Cancellation Rule;

d.    postpone the effective date of the Third Mass Cancellation Rule to preserve the status quo and rights of Plaintiff States pending conclusion of the review proceedings, pursuant to 5 U.S.C. § 705;

e.    vacate and set aside the Third Mass Cancellation Rule, 5 U.S.C. § 706;

f.    award Plaintiff States reasonable fees, costs, expenses, and disbursements, including attorney's fees, associated with this litigation; and

g.    grant any additional and further relief as the Court may deem just and appropriate.

Date: September 3, 2024

Respectfully Submitted,

**CHRISTOPHER M. CARR**
**Attorney General of Georgia**
Stephen J. Petrany
*Solicitor General*
Office of the Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

/s/ G. Todd Carter
G. Todd Carter, Esq.
Georgia Bar No: 113601
Special Assistant Attorney General
Office of the Georgia
Attorney General
Brown, Readdick, Bumgartner,
Carter, Strickland &Watkins, LLP
5 Glynn Avenue
P. O. Box 220
Brunswick, GA 31521-0220
Tel: 912-264-8544
Fax: 912-264-9667
tcarter@brbcsw.com

**ANDREW BAILEY**
**Attorney General of Missouri**

/s/ Joshua M. Divine
Joshua M. Divine*
    *Solicitor General*
Reed C. Dempsey*
    *Deputy Solicitor General*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel. (573) 751-1800
Fax. (573) 751-0774
josh.divine@ago.mo.gov
reed.dempsey@ago.mo.gov

*Pro hac vice pending

**STEVE MARSHALL**
**Attorney General of Alabama**

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.*
   *Solicitor General*
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36130-0152
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Pro hac vice pending

**TIM GRIFFIN**
**Attorney General of Arkansas**

/s/Nicholas Bronni
Nicholas J. Bronni*
   *Solicitor General*
Dylan L. Jacobs*
   *Deputy Solicitor General*
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-3661
Nicholas.Bronni@arkansasag.gov
Dylan.Jacobs@arkansasag.gov

*Pro hac vice pending

**ASHLEY MOODY**
**Attorney General of Florida**

/s/James H. Percival
James H. Percival*
   *Chief of Staff*
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
james.percival@myfloridalegal.com

*Pro hac vice pending

**DREW H. WRIGLEY**
**Attorney General of North Dakota**

/s/ Philip Axt
Philip Axt*
   *Solicitor General*
North Dakota Attorney General's Office
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
Telephone: (701) 328-2210
pjaxt@nd.gov

*Pro hac vice pending

**DAVE YOST**
**Attorney General of Ohio**

/s/ T. Elliot Gaiser
T. Elliot Gaiser*
   *Solicitor General*
Mathura J. Sridharan*
   *Deputy Solicitor General*
Office of the Attorney General
365 East Broad Street
Columbus, Ohio 43215
Phone: (614) 466-8980
thomas.gaiser@ohioago.gov

*Pro hac vice pending