UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| Plaintiff, ) | Civil Action No. |
| ) | |
| v. ) | **COMPLAINT** |
| ) | |
| **CITY OF BRUNSWICK,** ) | |
| **GEORGIA** ) | |
| ) | |
| Defendant. ) | |

The United States of America, by its undersigned attorneys, alleges:

## INTRODUCTION

1. The United States brings this civil action for declaratory and injunctive relief against the City of Brunswick, Georgia ("the City" or "Brunswick"), under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §§ 2000cc–2000cc-5. This civil action is based on the City's efforts to shut down The Well, a Christian services center for those experiencing homelessness, run by FaithWorks, an organization under the umbrella of the South Georgia Conference of the United Methodist Church.

2. Through its campaign to shut down The Well, including a mandatory closure order and a nuisance lawsuit, Brunswick imposed a substantial burden on the religious exercise of FaithWorks, and of The Well's staff and leadership, without a compelling interest and without using the least restrictive means of achieving that interest, in violation of RLUIPA, 42 U.S.C. § 2000cc(a)(1).

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345 and 42 U.S.C. § 2000cc-2(f).

4. Venue is proper under 28 U.S.C. § 1391(b) because the actions giving rise to this action occurred in the Southern District of Georgia.

**DEFENDANT**

5. Brunswick, a municipality in Glynn County, Georgia, is governed by a five-member City Commission, including four elected Commissioners and a Mayor. The Commission appoints a City Manager to oversee the City's operations, as well as five members and two alternates to comprise the Planning and Appeals Commission, which makes recommendations on special use applications, including conditional use permit applications and zoning variances. The City Commission has authority to amend the City's code, including its Zoning Ordinance, and to grant or deny conditional use permits.

6. Brunswick is a "government" as defined by RLUIPA, 42 U.S.C. § 2000cc-5(4)(A)(i).

**FACTS**

**The Well**

7. The Well is located at 1101 Gloucester Street in Brunswick, Georgia, about six to ten blocks from the heart of downtown Brunswick. The Well has been in operation at this location since 2014. The Well is run by Southeastern Education Services, a religious ministry under the United Methodist Church, which does business under the alias FaithWorks.

8. The Well, open during daytime hours, is a hospitality and religious resource center, as well as a warming shelter in inclement weather, for those experiencing homelessness. The Well does not provide overnight shelter, except when it operates as a warming shelter.

9. FaithWorks' staff members run The Well as an expression of their Christian faith and their duty to serve those in need, including unhoused individuals.

10. The Well provides various services to its guests, including showers, laundry, breakfast and lunch, and a safe place to congregate with air conditioning or heating. The Well also assists guests in obtaining identification cards and birth certificates, conducts triage for housing needs, screens for mental health issues, transports guests to medical appointments, offers voluntary religious services, and arranges for housing and other benefits. The Well allows its guests to have their mail sent to The Well.

11. The Well receives about 60 guests every day. Some guests are dropped off by law enforcement agencies because of the array of services that The Well provides, with no notice given to The Well. Other guests are sent to The Well from the Salvation Army in Brunswick, the local hospital, and from Gateway Behavioral Health Services, a state-run mental and behavioral health institution.

12. The Well is a key player in Brunswick's services to those experiencing homelessness, and the City has relied on The Well's services. For example, in 2022, the City prepared an annual report when seeking $1.15 million in federal financial assistance through Community Development Block Grants from the Department of Housing and Urban Development. In the report, in response to questions about how Brunswick is trying to "reduc[e] and end homelessness," the report extensively cited the services provided by The Well to those experiencing homelessness, explaining that "The Well serves as a resource and hospitality center to those experiencing homelessness during the day," and offers services including "showers, laundry, case management, assistance with medications, access to mental health care," among other services. The City's report further explained that "The Well receives many individuals just released from jail or prison immediately homeless upon release" and that "[l]aw enforcement agencies and crisis units in neighboring counties continue to provide transportation to the Well

without notice given"; The Well's staff "is expected to care for those who arrive with severe mental and physical disabilities" even though "care is required far beyond what [The Well] can provide, and there is no clear solution or assistance on where these individuals can go."[1]

13. Similarly, Brunswick's annual report in 2024 recognized that FaithWorks, the operator of The Well, provides daytime services to adults experiencing homelessness and noted that the local "hospital and FaithWorks have a working relationship and occasionally meet to discuss issues" to help prevent "individuals and families and from becoming homeless."[2]

14. The City has also relied on The Well as a warming shelter when temperatures drop below freezing and sleeping outdoors would be hazardous for unhoused individuals. Further, The Well helped the City develop solutions for Brunswick's unhoused population at the beginning of the COVID-19 pandemic, after Georgia's executive order to shelter in place was issued.

**Brunswick's City Commission Votes to Shut Down The Well**

15. On October 5, 2022, the Brunswick City Commission passed the Urban Camping and Improper Use of Public Spaces Ordinance (No. 1075), prohibiting camping—including using a space to sleep or store personal belongings—in public spaces and on private property.

16. At the April 5, 2023 Brunswick City Commission meeting, members of Brunswick's Neighborhood Planning Assembly ("NPA") shared their concerns with the rise in violent crime in Brunswick, which the NPA associated with vagrancy and homelessness. Some commenters at the April 5 meeting expressed their belief that recent violent incidents, or the perpetrators of these incidents, were connected to The Well. The NPA and other City residents implored the Commission to use its power to close The Well.

---

[1] City of Brunswick, 2022 Annual Action Plan, Community Development Block Grant Program.
[2] City of Brunswick, 2024 Annual Action Plan, Community Development Block Grant Program.

17. At the April 5 City Commission meeting, FaithWorks' Minister of Operations spoke to explain that the violent incidents were not committed by people with any current relationship with The Well, and that to shut down The Well would only exacerbate the City's challenges with providing services to unhoused individuals. Brunswick's Mayor acknowledged at the meeting that "several of the instances that we have seen of violence did not happen at The Well; they happened with people coming out of abandoned properties and attacking people moving through our city."

18. Nonetheless, on April 11, 2023, the Mayor sent The Well a letter requesting that it "immediately close its door and cease all operations" on the grounds that there "have been multiple, violent attacks on city residents" that "all share some discernable connection with The Well." This letter did not cite an ordinance, regulation, or other legal authority underlying the closure request.

19. Around this time, FaithWorks' Board advised The Well, based on the Mayor's April 11 letter, conversations with City officials, and mounting community pressure, to temporarily close for 65 days. The Board encouraged The Well's leadership to use this temporary closure to better understand rising concerns from the community regarding The Well and implement measures to address these concerns. The Well's leadership understood that if The Well did not close on its own accord, the City would seek a court order to compel its closure.

20. The Well's staff made the decision to temporarily close The Well's doors, effective April 21, 2023, and asked campers to cease camping or loitering on JF Mann Way, the alley adjacent to The Well.

21. On April 19, 2023, at the regularly scheduled City Commission meeting, the City Commission passed Ordinance 1078, amending Chapter 13 of the Brunswick City Code, Article

19 – Homelessness Services. The stated purpose of the Ordinance is to consider the "impact" of the location of homelessness services "on the surrounding business, residences, and other service providers." Ordinance 1078 applies to "all persons, businesses, or non-profit organizations presently engaged in or proposing to be engaged in the provision of services to homeless individuals" in Brunswick. Those service providers must "first obtain[] a conditional use permit . . . and an occupational tax license" to operate. This Ordinance provides that the City Commission will decide whether to issue a Conditional Use Permit, and in making that decision, may consider eight discretionary factors, including whether there was a previous lawful use, whether there are other shelters close by, and "[o]ther factors that may affect the general public health and welfare." The Ordinance also prohibits after-hours loitering or camping on the surrounding streets and sidewalks.

22. At the end of the April 19 City Commission meeting, the Commission voted unanimously, after meeting in executive session, to order a 65-day closure of The Well.

23. On April 21, 2023, the Brunswick Mayor sent a letter to Reverend Wright Culpepper, who oversees FaithWorks and The Well, notifying him of the closure order, as well as an order for The Well to remove the trash bins and portable toilets on JF Mann Way. This letter did not cite what ordinance, regulation or other legal authority underlay the closure order. Reverend Culpepper received this letter the following week, after having already closed The Well on April 21.

24. Because The Well had operated at its 1101 Gloucester St. location since 2014, years before Ordinance 1078 was enacted, FaithWorks understood that the Ordinance's Conditional Use Permit application process did not apply to The Well's existing operation on Gloucester Street.

**The Well Addresses the City's Concerns**

25. While The Well was temporarily closed, The Well's staff members used the time to reassess their operations and develop policies to address the safety concerns expressed by the NPA and the City.

26. The Well's management also met with Brunswick's Mayor, City Manager, Police Department, and other City organizations to better understand how to address the City's concerns, with the goal of reopening The Well's doors after the 65-day closure order.

27. In April 2023, FaithWorks applied for a Conditional Use Permit (CUP) to operate a resource center for those experiencing homelessness at a new location in Brunswick that was further away from the downtown business district. The City responded that the application did not contain the information required by Ordinance 1078 and it was therefore canceling the advertised public hearing for the CUP before the Planning and Appeals Commission. FaithWorks responded with the requested information and asked the City to immediately reschedule the public hearing. The City again responded that the application lacked sufficient information and refused to schedule a public hearing.

28. On June 9, 2023, the City Manager wrote to Reverend Culpepper, formally requesting that The Well *not* reopen its facility at 1101 Gloucester St. at the end of the 65 days, but rather continue to pursue reopening The Well at a new location, and file for a CUP for that new location under Ordinance 1078. The City Manager acknowledged that FaithWorks had applied for a CUP for a new location in Brunswick, but that application was pending. She wrote that as an alternative, The Well could voluntarily seek a CUP for the 1101 Gloucester St. location.

29. During this closure period, The Well's staff met with the Brunswick Police Chief to share new proposed security measures and request the Chief's insight, and to seek help enforcing The Well's new rule against loitering or camping on JF Mann Way. The Well adopted the Chief's suggestions that, prior to being allowed back in The Well, all guests be required to visit the Brunswick Police Department to run outstanding warrant and sex offender checks, and to install additional security cameras and bright outdoor lights.

30. In addition to the measures suggested by the Brunswick Police Department, The Well instituted a number of security measures, policies, and procedures, including: guests are required to have or be in the process of obtaining identification; staff members monitor the comings and goings of guests and document this information using a software called the Homeless Management Information Service, which enables The Well to learn where the guests have been and to exclude anyone who is prohibited from entering The Well; no camping is allowed on JF Mann Way or on The Well's porch, where a fence has been erected; and finally, staff members are required to take trainings on topics including dealing with guests' mental health issues and de-escalating conflicts.

31. Also during this period, The Well's staff met with the Mayor to share the new policies and procedures, including those recommended by the Police Chief, and to ask for other measures The Well could take to address the City's concerns.

32. But nothing seemed to mollify the Mayor, who threatened to seek a judicial order shutting down The Well as a nuisance property if The Well reopened. He claimed that the City's decision was one of political necessity, to respond to voters' complaints. The Mayor suggested that The Well could reopen if it chose to rename itself and open quietly without Reverend Culpepper's leadership.

33. A meeting with the City Manager ended similarly. The City Manager posited that there was a small chance that The Well would be allowed to reopen at its current location. And like the Mayor, the City Manager added that as long as Revered Culpepper was in charge, the City would not continue to work with FaithWorks; if Reverend Culpepper resigned and The Well chose a new name, The Well might have a better chance of operating successfully at its proposed new location, which was further away from the downtown business district.

34. On June 19, 2023, after The Well's CUP application for the proposed new location had remained pending for a few months and the City refused to schedule the required public hearing, FaithWorks withdrew the application, believing the effort to be futile.

### The Well Reopens with New Safety Protocols

35. The Well reopened its doors in July 2023, with the new security measures, procedures and protocols outlined above addressing the City's and the community's concerns.

36. The Well reported these security procedures and protocols to the City prior to reopening. These changes were also reported in the local news.

37. The Well's guests have respected The Well's no camping policy.

38. Brunswick's Police Chief reported that no crime occurred at or near The Well when it was closed, and that in the first month after it was reopened, the Brunswick Police Department responded to only five calls, including a welfare check, an attempted suicide, and an officer-initiated checkup. *See* Kailey Cota, *Brunswick blames crime on homeless shelter and sues to shut it*, The Current (Aug. 8, 2023), https://thecurrentga.org/2023/08/08/brunswick-blames-crime-on-homeless-shelter-and-sues-to-shut-it/ ("*Brunswick blames crime on homeless shelter*").

**The City Files a Nuisance Complaint and Seeks to Permanently Close The Well**

39. On July 21, 2023, a little over two weeks after The Well reopened, The City filed a Complaint in Glynn County Superior Court against Southeastern Educational Services, alleging a public nuisance claim and seeking a permanent injunction to shut down The Well (the "Superior Court Complaint"). With its Superior Court Complaint, the City filed an *ex parte* Motion for an Emergency Temporary Restraining Order ("TRO Motion") seeking to preliminarily and permanently enjoin The Well from operating.

40. In the Superior Court Complaint and TRO Motion, the City alleged, among other things, that The Well unlawfully operates an overnight shelter in the City's downtown business district, and that it did not apply for a CUP and is therefore prohibited from providing overnight services. In its papers, the City also claimed that from 2018 through 2022, the Brunswick Police Department received on average 0.8 to 1.4 calls per day to The Well's location, and that upon The Well's closure, the number of calls for service plummeted. The City also listed five unconnected violent incidents allegedly involving persons connected to The Well in 2022 and 2023 as reasons why The Well is a public nuisance.

41. The City's methodology for computing calls "to" The Well's location is to document all calls to the police within a three-block radius of The Well. This includes calls unconnected to but near The Well and calls for assistance for any reason—to report a crime, suicide prevention, medical emergency, welfare check—initiated by someone at The Well, a neighbor, a third party, or police officers in the area.

42. *The Current*, a local newspaper, debunked the statistics regarding calls to The Well and undermined the City's allegation that these calls indicated rampant criminal activity, with a quote from the Police Chief, who reported that "the calls have been largely nonviolent and alone

do not suggest a larger preponderance of crime." *Brunswick blames crime on homeless shelter.*

43. In its TRO Motion, the City failed to acknowledge The Well's new operating and enhanced security procedures upon reopening, and alleged the opposite in its Complaint, for example, that "[T]he Well does not maintain a safety or security plan." Superior Court Complaint ¶ 27. The City's submission also failed to mention that The Well's new security policies were recommended by, and have been instituted in coordination with, the Brunswick Police Department.

44. In its opposition to the City's TRO Motion, FaithWorks submitted facts to rebut the alleged connections between the five violent incidents and The Well. Those facts indicate that there is no causal or material connection between The Well and the criminal incidents mentioned in the City's Complaint or TRO Motion. For example, The Well's opposition explained that some alleged perpetrators had briefly stayed at The Well months or even years before the alleged crimes.

45. The number of police calls from The Well does not, by itself, suggest criminal activity at The Well or by individuals who seek assistance from The Well. Many police calls are prophylactic in nature and reflect The Well's continued coordination with the Brunswick Police Department to enforce The Well's safety protocols. For example, in October 2024, The Well requested increased nighttime patrol to ensure that individuals were not sleeping outside The Well; these police visits are documented as calls to the police.

46. Other police calls in the vicinity of The Well may have little or nothing to do with operation of The Well. For example, some calls are placed after hours when The Well is closed and not accepting guests.

47. Nevertheless, from when The Well reopened in July 2023 through November 21,

2024, during which time The Well operated under new safety protocols, an average of fewer than 10 police calls from or near The Well were made per month, the lowest volume of police calls from or near The Well in over five years.

48. In June 2024, The Well's staff met with the City Manager, the Police Chief, and the Assistant City Manager. The officials—one of whom suggested, a year earlier, that The Well shut down for good—praised The Well for implementing procedures that have led to a dramatic drop in police calls, loitering, and other complaints. Nevertheless, the City's nuisance action remains pending.

49. The Brunswick Police Department continues to drop off people who have nowhere else to go at The Well. As recently as December 10, 2024, the Brunswick Police Department dropped off a homeless individual needing assistance at The Well.

### The City's Efforts to Shut Down The Well Impose a Substantial Burden on FaithWorks' Religious Exercise

50. Brunswick's efforts to permanently shut down The Well impose a substantial burden on the religious exercise of The Well's and FaithWorks' staff and leadership.

51. The City's actions, including its suggestion that The Well rename itself and jettison its religious minister, make clear that the City will not permit The Well to operate anywhere in Brunswick.

52. Operating The Well is an expression of faith that is substantially burdened by the City's efforts to permanently close The Well. FaithWorks, which runs The Well, is an extension of the Methodist Church, and providing basic services to the poor and unhoused individuals are cornerstones of FaithWorks' religious practice. FaithWorks and The Well are led by Reverend Culpepper and his staff of Christian ministers. And at The Well, staff members offer the opportunity for prayer and religious study to those who are interested.

53. The Well has lawfully operated at its 1101 Gloucester St. location since 2014 and is not required to apply for a CUP under Ordinance 1078 to continue operating its resource center at that location.

54. The Well and FaithWorks had and have a reasonable expectation of engaging in religious exercise at The Well through helping the poor and unhoused individuals.

55. The City has refused to consider The Well's enhanced security measures, procedures and policies, including those adopted at the suggestion of the Brunswick Police Department, instead warning The Well not to reopen and subsequently seeking a court order to shut The Well down after it reopened.

56. Given these security measures, the City cannot demonstrate that shutting down The Well advances a compelling governmental interest.

57. Even if a compelling interest was implicated, the City cannot show that shutting down The Well or forcing FaithWorks to adopt new religious leadership is the least restrictive means of achieving the City's purported interest. The City cannot show that shutting down The Well is necessary to protect safety, particularly when The Well has already adopted procedures that have addressed the City's purported safety concerns, and has successfully operated under those procedures for over a year.

58. Further, the City continues to avail itself of The Well's services to those experiencing homelessness and to tout The Well's services as evidence of the City's efforts to help combat homelessness while at the same time seeking to shut down The Well.

59. FaithWorks has a "property interest" in The Well within the meaning of 42 U.S.C. § 2000cc-5(5).

60. FaithWorks' efforts to serve unhoused individuals through The Well constitute "religious exercise" within the meaning of 42 U.S.C. § 2000cc-5(7).

61. The Well's services, and the City's actions to shut down The Well, affect "commerce among the several States" within the meaning of 42 U.S.C. § 2000cc(a)(2)(B).

62. The City's Zoning Ordinance involves "individualized assessment[s]" within the meaning of 42 U.S.C. § 2000cc(a)(2)(C). The Conditional Use Permit application process, the City Commission's vote to close The Well, and the City's decision to file its nuisance lawsuit are "individualized assessment[s]" within the meaning of 42 U.S.C. § 2000cc(a)(2)(C).

63. The City's Zoning Ordinance, including Ordinance 1078, is a "land use regulation" within the meaning of 42 U.S.C. § 2000cc–5(5). The City's closure order and other efforts to shut down The Well constitute the imposition or implementation of a "land use regulation" within the meaning of 42 U.S.C. § 2000cc(a)(1).

64. At all times relevant, the City did not have in place procedures or practices to ensure City officials were able to satisfy their obligations under RLUIPA, including but not limited to, providing training to City officials and staff involved in religious land use determinations, and having established procedures to address complaints concerning denials of rights under RLUIPA.

## VIOLATION OF RLUIPA: SUBSTANTIAL BURDEN

65. The Defendant's actions described in this Complaint have imposed, and continue to impose, a substantial burden on the religious exercise of The Well's staff and leadership in violation of RLUIPA, 42 U.S.C. § 2000cc(a)(1)-(2).

66. The Defendant's efforts to permanently shut down The Well do not further a compelling governmental interest using the least restrictive means. 42 U.S.C. § 2000cc(a).

## PRAYER FOR RELIEF

**WHEREFORE**, the United States prays that this Court enter an order that:

A. Declares that the Defendant's conduct, as alleged herein, violates RLUIPA;

B. Enjoins the Defendant, its Mayor, Commissioners, officers, employees, agents, successors, and all other persons in concert or participation with it, from imposing a substantial burden on the religious exercise of FaithWorks and The Well's staff and leadership that is not narrowly tailored to further a compelling governmental interest; and

C. Requires the Defendant, its Mayor, Commissioners, officers, employees, agents, successors, and all other persons in concert or participation with it, to:

   i. Take such actions as may be necessary to restore, as nearly as practicable, The Well to the position it would have been in but for Defendant's unlawful conduct, including, but not limited to, withdrawing its Complaint and Motion for a Temporary Restraining Order against The Well in Glynn County Superior Court, and cease requiring The Well to submit to the conditional use permit approval process under Ordinance 1078 to continue operating at its current location;

   ii. Take such actions as may be necessary to prevent the recurrence of such unlawful conduct in the future, including, but not limited to, meaningful consideration of The Well's applications for conditional use permit(s) at other location(s); and

D.  Awards such additional relief as the interests of justice may require.


Dated: December 16, 2024                                    Respectfully submitted,

                                                                MERRICK B. GARLAND
Attorney General


JILL E. STEINBERG                                           KRISTEN CLARKE
United States Attorney                                      Assistant Attorney General
Southern District of Georgia                                Civil Rights Division

CARRIE PAGNUCCO
Chief

MICHAEL S. MAURER
Deputy Chief


 /s/ Bradford C. Patrick                                     /s/Noah D. Sacks
BRADFORD C. PATRICK                                         AMEYA S. ANANTH
Assistant United States Attorney                            NOAH D. SACKS
22 Barnard Street, Suite 300                                Trial Attorneys
Savannah, GA 31401                                          Housing & Civil Enforcement Section
Phone: (912) 652-4422                                       950 Pennsylvania Ave. NW – 4CON
Fax:(912)652-4427                                           Washington, DC 20530
Bradford.Patrick@usdoj.gov                                  Phone: (202) 514-4713
                                                            Fax: (202) 514-1116
JENNIFER STANLEY                                            Ameya.Ananth@usdoj.gov
Assistant United States Attorney                            Noah.Sacks@usdoj.gov
600 James Brown Blvd., Suite 200
Augusta, GA 30901
Phone: (912) 652-4422
Fax:(912)652-4427
Jennifer.Stanley@usdoj.gov